J-S02015-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.G., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.G., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2326 EDA 2024 |

Appeal from the Order Entered October 1, 2024
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0001757-2012

| | | |
|---|---|---|
| IN THE INTEREST OF: A.G., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.G., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2327 EDA 2024 |

Appeal from the Decree Entered August 14, 2024
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000174-2023

| | | |
|---|---|---|
| IN THE INTEREST OF: J.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: J.G., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2328 EDA 2024 |

Appeal from the Order Entered October 1, 2024
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000589-2020

| | | |
|---|---|---|
| IN THE INTEREST OF: J.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |

APPEAL OF: J.G., MOTHER :
:
:
:
:
:
:
: No. 2329 EDA 2024

Appeal from the Decree Entered August 14, 2024
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000175-2023

IN THE INTEREST OF: J.P., A MINOR : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
APPEAL OF: J.G., MOTHER :
:
:
:
:
:
:
: No. 2330 EDA 2024

Appeal from the Order Entered October 1, 2024
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000590-2020

IN THE INTEREST OF: J.P., A MINOR : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
APPEAL OF: J.G., MOTHER :
:
:
:
:
:
:
: No. 2331 EDA 2024

Appeal from the Decree Entered August 14, 2024
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000176-2023

BEFORE: LAZARUS, P.J., DUBOW, J., and McLAUGHLIN, J.

MEMORANDUM BY LAZARUS, P.J.: **FILED MARCH 27, 2025**

- 2 -

J.G. (Mother)[1] appeals from the orders and decrees,[2] entered in the Court of Common Pleas of Philadelphia County, Juvenile Division, changing the permanency goal from reunification to adoption and granting the Philadelphia Department of Human Services' (DHS) petitions to involuntarily terminate Mother's parental rights to her minor children, A.G. (born January 2011)[3] and twins, Jo.P. and Ja.P. (born May 2014) (collectively, Children).[4] Because Mother is unable to remedy the conditions that brought Children into care—lack of parental supervision, inadequate housing, and parental drug, alcohol, and mental health concerns—and termination is in Children's best interests, we affirm on the basis of the trial court opinion. **See** 23 Pa.C.S.A. §§ 2511(a)(2) & (b).

---

[1] The twins' father, J.P., Sr. (Father), also appealed from the trial court's goal change orders and the decrees terminating his parental rights. **See** 3017 EDA 2023, 3018 EDA 2023, 3019 EDA 2023, and 3020 EDA 2023. On August 6, 2024, our Court affirmed the orders and decrees, relying on the trial court's opinion, noting that Father has not cooperated with the Community Umbrella Agency (CUA) and has spent a great deal of time fighting with his caseworker, attorney, and the court, "rather than making a legitimate effort to achieve his [single case plan] objectives and reunif[y] with his children." **In the Interest of J.P., et al.**, Nos. 3017-3020 EDA 2023, at *4 (Pa. Super. filed Aug. 6, 2024) (unpublished memorandum).

[2] On October 7, 2024, our Court *sua sponte* consolidated these appeals, as they involve related parties and issues. **See** Pa.R.A.P. 513.

[3] A.G.'s father is unknown. **See** Appellant's Brief, at 8.

[4] Mother has complied with the dictates of **Commonwealth v. Walker**, 185 A.3d 969 (Pa. 2018), by filing separate notices of appeal for each dependency and adoption docket number.

In January 2019 and June 2020, DHS received General Protective Services (GPS) reports about Children lacking parental supervision, having inadequate housing, and general concerns about Mother's and Father's drug and alcohol use. At the time, Children were living with Mother. On June 2, 2020, DHS obtained an order of protective custody (OPC) for Children and, with police assistance, placed them in a foster home. On June 23, 2020, the CUA held a single case plan (SCP) meeting in which Mother participated via telephone. Mother's SCP objectives included enrolling in drug and alcohol treatment, following any drug and alcohol treatment recommendations, signing all releases, obtaining safe and stable housing, attending weekly supervised visits with Children, and attending mental health counseling. *See* N.T. Goal Change/Termination Hearing, 11/2/23, at 15.

A.G. was adjudicated dependent on August 20, 2020;[5] the twins were adjudicated dependent on March 30, 2021. Children were placed in kinship care with paternal uncle and aunt (Foster Parents), who are an adoptive resource.

Mother has not attended any SCP meetings with her CUA caseworker, Silvine Belzince, over the entire life of the case, has not attended any court-ordered drug or alcohol assessments or screenings at the Clinical Evaluation Unit (CEU), has never obtained stable housing, has not attended parenting

_____

[5] The trial court incorrectly states that A.G. was adjudicated delinquent on December 23, 2020. *See* Trial Court Opinion, 11/5/24, at 15.

- 4 -

classes, and never progressed to unsupervised visits with Children.[6] At the time of the termination hearing, Mother was not consistently attending visits with Children and, in fact, her last visit had been eight months prior to the goal change/termination hearing in March 2023. *See* N.T. Goal Change/Termination Hearing, 11/2/23, at 22. Belzince testified that Mother does not call Children on the phone, send them gifts or cards on special occasions or holidays, or ask Belzince how the Children are doing when Belzince talks to her on the phone. *Id.* 24. Belzince testified that Mother does not participate in Children's medical or educational appointments. *Id.* Mother has, however, routinely signed releases and consents for Children. *See* N.T. Goal Change Hearing, 7/6/23, at 15-16.

Belzince also testified that Mother does not believe she has a drug or alcohol problem, but only mental health issues. *Id.* at 17. To that point, Mother receives mental health treatment at COMHAR, where she has been diagnosed and medicated for her conditions. *Id.* at 17-18.

Belzince testified that Mother routinely contacts her twice a month, at which time Belzince reviews Mother's SCP objectives with her and confirms her visits with Children.[7] *Id.* at 15-16. Mother told Belzince that she does

_____

[6] In fact, Belzince testified that Mother declined the opportunity to increase her visits with A.G. to two hours and not at the agency because Mother "did not know what to do with [A.G.] for two hours in the community." N.T. Goal Change/Termination Hearing, 11/2/23, at 21.

[7] Belzince testified that Mother has a pattern of confirming her visits over the phone with her, but then not attending the visits. *Id.* at 22-23. In fact, Belzince testified that Mother had only attended one visit in March, two visits in February, but no visits in January of 2023. *Id.* at 23.

not have anywhere to live, that she often stays at a shelter or friends' houses; Mother has never provided DHS with an address where she can be contacted. *Id.* at 19. Belzince testified that Mother had been referred to ARC, a low-income housing resource, but Mother never followed through to use this resource to secure stable housing. *Id.* Belzince testified she believes Mother's sole source of income is social security. *Id.* 20. Overall, Belzince rated Mother's SCP progress and compliance as "minimal." *Id.* at 24-25.

With regard to their placement, Belzince testified that A.G. has been living with his siblings at Foster Parents' home since September 2023, and that he is doing "fine" there.[8] *Id.* at 26. Belzince testified that A.G. has a lot of "aggressions[,] does display anger[, and] probably needs [behavioral health services] in school." N.T. Goal Change/Termination Hearing, 11/2/23, at 26. Belzince testified that A.G.'s Individualized Education Plan (IEP) is being reevaluated, that he is playing football at school, and that he is doing well academically. *Id.* at 26-27. At the time of the termination hearing, Belzince testified that A.G. was up-to-date on all medical, dental, and vision appointments, that Foster Parents were providing a safe environment for him and fulfilling his educational needs, and that A.G. had "adjusted quite well" to his kinship care home. *Id.* at 28-29. Finally, Belzince testified that A.G. does not wish to see Mother, that she does not believe Mother and A.G. have a

_____

[8] A.G. had been initially placed in a different foster home until he expressed his desire to be placed with his siblings. In September 2023, he moved into Foster Parents' home with his twin brothers. *See* N.T. Goal Change/Termination Hearing, 11/2/23, at 25.

parent-child bond, that if Mother's parental rights were terminated A.G. would not suffer any irreparable harm, and that it would be best for A.G. if he were to be adopted by Foster Parents. *Id.* at 30-31.

Belzince testified that Jo.P. and Ja.P. are "doing fantastic" in Foster Parents' care; the twins had been living in the foster home for over two years at the time of the goal change/termination hearing. *See* N.T. Goal Change Hearing, 7/6/23, at 13; N.T. Goal Change/Termination Hearing, 11/2/23, at 32-34. Belzince testified that Jo.P. is doing well academically, is up-to-date on his medical, dental, and vision appointments, has a "loving" relationship with his Foster Parents, and relies on Foster Parents for support and to meet his daily needs. *Id.* at 36. Belzince testified that Jo.P. does not share a parent-child bond with Mother, *id.* at 38, that Jo.P. believes Mother does not want him, and that he recognizes that Mother does not come to visit him. *Id.* at 39. On the other hand, Belzince testified that Jo.P. has a parent-child-type bond with Foster Parents, that he is happy in their home, and that he "wants to stay there." *Id.* Finally, Belzince testified that Jo.P. would not suffer any irreparable harm if Mother's parental rights were terminated and that adoption by Foster Parents is the most appropriate placement for Jo.P. *Id.* at 40.

Belzince testified that Ja.P., who is autistic and non-verbal, has an IEP in elementary school that addresses his special needs, that he attends the Center for Autism every three months, and that he exhibits aggressive behaviors at school. *Id.* at 41-42. Belzince testified that Foster Mother is a special education teacher who is able to meet Ja.P.'s special needs. *See id.*

at 44 (Belzince testifying Foster Mother is "very patient" with Ja.P., "utiliz[es] all her tools and resources" as a teacher to help him, and "is able to ensure that all the proper services are in place"). Like Jo.P., Ja.P. shares a parent-child-like bond with Foster Parents and looks to them for his day-to-day needs; Foster Parents have kept him up to date on all medical, dental, and vision appointments, and provide for him and keep him safe. *Id.* 41-44. Finally, Belzince testified that Ja.P. would not suffer any irreparable harm if Mother's parental rights were terminated and that adoption by Foster Parents is the most appropriate placement for Jo.P. *Id.* at 45. *See id.* at 49 (Belzince testifying foster family "provid[e] a loving, stable[,] support[ive] home for the children . . . and [t]hey're treating them like they're their biological child[ren].").

On May 3, 2023, DHS filed petitions to involuntarily terminate Mother's parental rights to Children pursuant to subsections 2511(a)(1), (a)(2), (a)(5), (a)(8), and (b) of the Adoption Act.[9] On July 6, 2023, the court held a goal change hearing where[10] caseworker Belzince, Foster Mother, and Father

---

[9] 23 Pa.C.S.A. §§ 2101-2938.

[10] Children were represented by guardian *ad litem*, Gary Server, Esquire, and attorney, Lisa Marie Visco, Esquire, at the goal change/termination hearings. *See* 23 Pa.C.S.A. § 2313(a) (children have statutory right to counsel in contested involuntary termination proceedings) and *In re K.R.*, 200 A.3d 969 (Pa. Super. 2018) (en banc), *but see In Re: T.S., E.S.*, 192 A.3d 1080, 1092 (Pa. 2018) ("[D]uring contested termination-of-parental-rights proceedings, where there is no conflict between a child's legal and best interests, an attorney-guardian *ad litem* representing the child's best interests can also represent the child's legal interests.").

testified. However, at the beginning of the proceeding, the trial judge determined that there was an issue with regard to whether Mother had been properly served notice of the goal change hearing "in the absence of a [Parent Locator Service.]" N.T. Goal Change Hearing, 7/6/23, at 10; *see id.* at 36-37 (trial judge explaining city needs to run PLS to try to find Mother's last known address for service purposes, so "we're going to have to bring [this] back for another time where the city can prove to me that they did serve Mo[ther] at any and all known address and that M[other] did have the proper notice of the hearing."). Thus, the court bifurcated the proceedings and only took testimony regarding Father, leaving the issue of proper service to another day. *Id.* However, at the conclusion of the hearing, the court determined that it would reschedule the goal change hearing, to be heard in conjunction with a termination hearing.

On November 2, 2023, the trial court held a goal change/termination hearing, at which CUA caseworker Belzince testified.[11] Neither Mother nor Father attended the hearing. At the commencement of the proceedings, the trial judge found that the Commonwealth had made a good faith effort to serve Mother by attempting to serve her at the address on the PLS and at another address that DHS had on file for Mother. **See** N.T. Goal Change/Termination Hearing, 11/2/23, at 4-8. **See also id.** at 33 (Belzince testifying she told Mother about date of goal change/termination hearing). Although DHS

_____

[11] All testimony from the July 6, 2023 proceeding was incorporated into the goal change/termination proceeding held on November 2, 2023. **See** N.T. Goal Change/Termination Hearing, 11/2/23, at 5-6, 12.

acknowledged that the PLS was dated February 16, 2023, DHS and the court

recognized that Mother is "transient" and that it "did not have information as

to where she's staying . . . or if she has an address at all." *Id.* at 7.

On August 24, 2024, the court granted DHS' petitions to involuntarily

terminate Mother's parental rights to Children and change the goal to

adoption. Mother appealed[12] and has complied with Pa.R.A.P. 1925(b). On

appeal, Mother raises the following claims:

(1)    Whether the [t]rial [c]ourt erred by terminating the parental
       rights of [Mother] under [sections] 2511(a)(1), (a)(2),
       (a)(5), (a)(8), and (b)?

(2)    Whether it was a violation of [M]other's due process rights
       [to not provide M]other notice of the termination of parental
       rights and goal change hearings, thereby denying Mother an
       opportunity to be heard[?]

_____

[12] Mother filed a petition to appeal *nunc pro tunc* from the termination decrees
and goal change orders. However, the trial court denied her requested relief.
Mother appealed that decision and, on June 18, 2024, this Court vacated the
orders denying Mother's petitions to appeal *nunc pro tunc* from the orders
changing the permanency goals to adoption and decrees terminating her
parental rights to Children. *See Interest of A.G.*, Nos. 574-579 EDA 2024
(Pa. Super. filed June 28, 2024) (unpublished memorandum decision). In
doing so, this Court explained that our review of the docket entries revealed
a breakdown in the operations of the court concerning entry of the goal change
and termination orders, where none of the docket entries concerning those
orders expressly stated that Pa.R.C.P 236 notice had been provided. Notably,
however, our Court found that Mother had been properly served with the goal
change and termination petitions.

Thus, we remanded the case and instructed Mother's counsel to update
Mother's current address with the trial court and directed the clerk of courts
to reenter the termination/goal change orders/decrees with appropriate Rule
236 notice, after which Mother could timely appeal within 30 days. *See id.*
The trial court complied and reentered the orders and decrees on August 14,
2024. Mother timely appealed from the reentered orders/decrees.

- 10 -

> (3) Whether the trial court erred by chang[ing] the goal from reunification to adoption?

Appellant's Brief, at 5-6 (renumbered and reworded for conciseness).

> In a proceeding to terminate parental rights involuntarily, the burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so. The standard of clear and convincing evidence is defined as testimony that is so clear, direct, weighty[,] and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue. It is well established that a court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence[,] in light of the totality of the circumstances[,] clearly warrants termination.

*In re Adoption of S.M.*, 816 A.2d 1117, 1122 (Pa. Super. 2003) (citation and quotation marks omitted); *see also In re C.P.*, 901 A.2d 516, 520 (Pa. Super. 2006) (party seeking termination of parental rights bears burden of proving by clear and convincing evidence that at least one of eight grounds for termination under section 2511(a) exists and that termination promotes emotional needs and welfare of child as set forth in section 2511(b)).

We review a trial court's decision to involuntarily terminate parental rights for an abuse of discretion or error of law. *In re A.R.*, 837 A.2d 560, 563 (Pa. Super. 2003). Our scope of review is limited to determining whether the trial court's order is supported by competent evidence. *Id.* Moreover, appellate courts "should defer to the trial judges[,] who see and hear the parties and can determine the credibility to be placed on each witness and . . . gauge the likelihood of the success of the current permanency plan[.]" *See In the Int. of K.T.*, 296 A.3d 1085, 1117 (Pa. 2023) (citation omitted).

- 11 -

Moreover, "[e]ven if an appellate court would have made a different conclusion based on the cold record, we are not in a position to reweigh the evidence and the credibility determinations of the trial court." *Id.*

After carefully reviewing the parties' briefs, the certified record, and the relevant case law and statutes, we affirm the trial court's orders and decrees on the basis of the well-written opinion authored by the Honorable John P. Sabatina, Jr. As the trial court correctly determined, reunification with Mother was no longer a viable permanency option where she had been, at best, minimally compliant with her SCP objectives, consistently failed to attend meetings and hearings (SCP and permanency), and did not visit, plan for, or financially support Children while they have been in placement. *See* Trial Court Opinion, 11/5/24, at 13-14. Moreover, the evidence showed that there was no parent-child bond between Mother and Children, such that severing it would cause irreparable harm, and that the love, comfort, security, and stability Children have with Foster Parents supports termination and the goal change to adoption. *See In re K.Z.S.,* 946 A.2d 753, 763 (Pa. Super. 2008) (courts must not only consider the child's bond with biological parent, but also "examine the intangibles such as the love, comfort, security, and stability the child might have with the foster parent").

We instruct the parties to attach a copy of Judge Sabatina's decision in the event of further proceedings in the matter.

Orders and decrees affirmed.[13]

Dubow, J., Did not participate in the consideration or decision of this case.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 3/27/2025

---

[13] Based on our disposition, Mother's challenge to the goal change orders have been rendered moot. **See Interest of D.R.-W.**, 227 A.3d 905 (Pa. Super. 2020).

- 13 -

Filed 12/6/2024 6:16:00 AM Superior Court Eastern District
2326 EDA 2024

## 2024 NOV -5 P 12:18 THE FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
### PHILADELPHIA COUNTY COURT OF COMMON PLEAS
### FAMILY COURT DIVISION

| | | |
|---|---|---|
| IN THE INTEREST OF: | : | CP-51-AP-0000174-2023 |
| A.R.G. | : | CP-51-DP-0001757-2012 |
| | : | No. 2326 &2327 EDA 2024 |
| | : | |
| IN THE INTEREST OF: | : | CP-51-AP-0000175-2023 |
| J.P.[1] | : | CP-51-DP-0000589-2020 |
| | : | No. 2328 & 2329 EDA 2023 |
| | : | |
| IN THE INTEREST OF: | : | CP-51-AP-0000176-2023 |
| J.P.[2] | : | CP-51-DP-0000590-2020 |
| | : | No. 2330 & 2331 EDA 2023 |
| | : | |
| APPEAL OF J.G. | : | FID: 51-FN-002621-2012 |
| | : | |

## OPINION

### PROCEDURAL HISTORY

The trial court held a multi-day hearing on the Petitions to Terminate the Parental Rights of J.P., the biological father ("Father") and J.G., the biological mother ("Mother"), of Jo.P. (D.O.B. May . , 2014), Ja.P., (D.O.B. May , 2014). and A.R.G. (D.O.B. January : , 2011). The dates on which the hearing occurred were July 6, 2023 and November 2. 2023. Father was present for the July 6, 2023 listing but failed to appear for the November 2, 2023 listing. Mother did not appear for either date of the hearing on the petition to terminate her parental rights. Both were represented by counsel at each date. The Children were represented by a Child Advocate. At the conclusion of the hearing, the trial court found clear and convincing evidence to involuntarily terminate the parental rights of Mother and Father[3] based upon their inability to remedy the conditions that brought the Children into care and to change the goal of the Children to adoption

---

[1] This child is referred to as "Jo.P." in this Opinion.
[2] This child is referred to as "Ja.P." in this Opinion.
[3] Father is not the biological father to A.R.G. Therefore, he was not a party to that matter.

Page 1

pursuant to 23 Pa. C.S.A. § 2511(a)(1)(2)(5)(8) and 23 Pa.C.S.A. § 2511(b). The Notices of Appeal were filed by Father on November 30, 2023. Mother filed a "Petition to Leave to File Appeal *Nunc Pro Tunc*" on December 14, 2023 which this court denied on January 24, 2024. Mother appealed the denial of her "Petition to Leave to File Appeal *Nunc Pro Tunc*" to the Superior Court. On June 18, 2024, the Superior Court vacated the orders denying Mother's petitions for *nunc pro tunc* relief and remanded for further proceedings. Mother's counsel complied with the instructions of the Superior Court on remand and subsequently, pursuant to the Superior Court's order, filed Notices of Appeal on September 7, 2024.

## STATEMENT OF MATTERS COMPLAINED OF ON APPEAL

Mother's Statements of Matters Complained of on Appeal for all three matters are identical and set forth below:

1. The trial court's determinations as to mother's conduct under 23 Pa.C.S.A. §2511(a)(1) were not supported by clear and convincing evidence.

2. The trial court's determinations as to mother's conduct under 23 Pa.C.S.A. §2511(a)(2) were not supported by clear and convincing evidence.

3. The trial court's determinations as to mother's conduct under 23 Pa.C.S.A. §2511(a)(5) were not supported by clear and convincing evidence.

4. The trial court's determinations as to mother's conduct under 23 Pa.C.S.A. §2511(a)(8) were not supported by clear and convincing evidence.

5. The trial court's determinations as to mother's conduct under 23 Pa.C.S.A. §2511(b) were not supported by clear and convincing evidence.

6. It was a violation of Mother's due process rights by not providing mother notice of the termination and goal change petitions and notice of the hearing date thereby denying mother an opportunity to be heard.

## FINDINGS OF FACT PRIOR TO THE FILING OF THE PETITION FOR INVOLUNTARY TERMINATION OF PARENTAL RIGHTS

On January 4, 2019, DHS received a General Protective Services (GPS) report alleging that the Philadelphia Police were dispatched to the family's home pursuant to a domestic dispute between the children's mother, J.G, and her paramour; that the police observed that Mother and her paramour were visibly intoxicated and appeared to be under the influence of alcohol and narcotics; that Mother had six unidentified children in the home; that Mother was unable to provide a safety resource for the children; and that the police would remain at the home. This report was determined to be valid. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023, Exhibit "A," ¶ "b", filed 5/3/2023).

On June 3, 2020, DHS received a GPS report alleging that Jo.P. and Ja.P. were observed sitting on top of home's refrigerator and banging on a window; that the children were believed to be in the home without adult supervision; that the Philadelphia Police were contacted but failed to arrive on the scene; that Mother subsequently returned home; that Mother might use drugs; and that the lack of supervision was ongoing. This report was determined to be valid. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023. Exhibit "A," ¶ "c", filed 5/3/2023).

On June 4, 2020, DHS went to the family's home. Six-year-old Jo.P. answered the door and stated that Mother was not at home, but that nine-year old A.G. was present. A.G. came to the door and stated that he did not know Mother's whereabouts; that he was uncertain for how long she had been gone; and that they had been left unsupervised. A.G. brought a cellular telephone to

the door but stated that he did not know Mother's telephone number. A.G. attempted to contact relatives via telephone, without success. A neighbor subsequently presented to DHS and attempted to reach Mother via telephone for approximately 30 minutes before making contact. DHS spoke with Mother and advised her that DHS was at the home and that the children were unsupervised. Mother was belligerent and used profanity, and DHS noted that her speech was slurred. Mother stated that she would return to the home. DHS observed that six-year- old Ja.P. was clothed in a diaper only. Ja.P. then exited the home and ran into the street. DHS had to stop an oncoming vehicle to prevent Ja.P. from being hit. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023, Exhibit "A," ¶ "d", filed 5/3/2023).

Approximately 45 minutes after DHS arrived at the home, Mother returned. Mother stated to DHS that she was going to contact the police; that she had been attempting to contact the landlord to address a plumbing issue with the home's toilet; and she Instructed A.G. to go upstairs and flush the toilet. DHS observed that water from the toilet was running from the ceiling into the kitchen and onto the refrigerator. Mother continued to display erratic behavior, which fluctuated between aggressive speech and behavior and uncontrollable crying. DHS asked Mother if there were any relatives who would be willing to care for the children. Mother contacted the children's maternal grandmother, who stated that she was employed, that she was unable to care for the children, and that there were no other family members willing and able to care for A.G., Jo.P., and Ja.P.. Mother stated that she did not have any friends or neighbors who could care for the children and that the children could not reside with their respective fathers. DHS advised Mother that the children could not remain in the home and Mother evicted DHS from the home. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023, Exhibit "A," ¶ "e", filed 5/3/2023).

On June 4, 2020, DHS obtained an Order of Protective Custody (OPC) for A.G., Jo.P., and Ja.P. and placed them with police assistance in a First Choice foster home. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023, Exhibit "A," ¶ "f", filed 5/3/2023). At the shelter care hearing held for A.G., Jo.P., and Ja.P. on June 5, 2020, the Court lifted the OPC and ordered the temporary commitment to stand. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023. Exhibit "A," ¶ "g", filed 5/3/2023).

On June 23. 2020. the Community Umbrella Agency (CUA) Northeast Treatment Center (NET) held a Single Case Planning (SCP) Meeting. Mother participated via telephone and Father did not participate. Mother's objectives were to maintain stable housing; enroll in and comply with a dual diagnosis program; sign all necessary release of information documents (ROI); cooperate with CUA; comply with the Achieving Reunification Center (ARC); and visit as allowed by the court order. Father's objectives were to sign all necessary ROI documents; cooperate with CUA; and visit as allowed by the court order. The SCP goal for A.G., Jo.P., and Ja.P. was reunification. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023, Exhibit "A," ¶ "h", filed 5/3/2023).

On July 8, 2020, an adjudicatory hearing was scheduled before the Honorable Deborah Canty. The hearing was continued due to no Judge sitting. It was ordered that the adjudication was deferred, and all prior orders were to stand. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023, Exhibit "A," ¶ "i", filed 5/3/2023).

On July 14, 2020, an adjudicatory hearing was held before the Honorable Vincent W. Furlong. The hearing was continued due to counsel being appointed for Father at the bar of the court. The Court further ordered the temporary commitment to stand; and adjudication was

deferred. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023, Exhibit "A," ¶ "j", filed 5/3/2023).

On July 29, 2020, an adjudicatory hearing was held before the Honorable Deborah Canty. The hearing was continued so that all the siblings' cases could be joined. The Court further ordered the temporary commitment was to stand; and the adjudication was deferred. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023, Exhibit "A," ¶ "k", filed 5/3/2023).

On August 20, 2020, an adjudicatory hearing was held before the Honorable Vincent W. Furlong. The hearing was continued for further investigation. The Court ordered the temporary commitment to stand; and adjudication was deferred. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023, Exhibit "A," ¶ "l", filed 5/3/2023).

On August 20, 2020, an adjudicatory hearing was held regarding A.G. The Honorable Vincent W. Furlong adjudicated A.G. dependent and found that A.G. was without proper care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals.[4] The Court ordered A.G. was to be fully committed to DHS. The Court further ordered that Mother was to be referred to the Clinical Evaluation Unit (CEU) for a dual diagnosis assessment and three random drug screens when the CEU resumed operations. The Court also ordered that Mother was to have supervised visits with A.G. at the agency. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023, Exhibit "A," ¶ "m", filed 5/3/2023).

On September 16, 2020, an adjudicatory hearing was held before the Honorable Vincent W. Furlong. The hearing was continued. The Court ordered the temporary commitment to stand;

---

[4] Only the adjudicatory hearing for A.R.G. was held on this date. The adjudicatory hearings for Jo.P. and Ja.P. occurred at a later date.

and the adjudication was deferred. The Court also ordered that Mother and Father were to be referred to Behavioral Health Services (BHS) for consultation/evaluation; and Father was to be referred to CEU for an assessment. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023, Exhibit "A," ¶ "n", filed 5/3/2023).

On November 9, 2020, an adjudicatory hearing was scheduled before the Honorable Vincent W. Furlong. The hearing was continued for further investigation. The Court ordered the temporary commitment to stand; and the adjudication was deferred. The Court also ordered that Mother and Father could have joint visits if there was no conflict. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023, Exhibit "A," ¶ "o", filed 5/3/2023).

On December 10, 2020, the CUA NET held a SCP Meeting. Mother and father did not participate. Mother's objectives were to maintain stable housing; enroll in and comply with a dual diagnosis program; sign all necessary ROI documents; cooperate with CUA; comply with ARC; and visit as allowed by the court order. Father's objectives were to sign all necessary ROI documents; cooperate with CUA; obtain stable housing; comply with BHS; comply with CEU; and visit as allowed by the court order. The SCP goal for the Children was reunification. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023, Exhibit "A," ¶ "p", filed 5/3/2023).

On December 23, 2020, an adjudicatory hearing was scheduled before the Honorable Vincent W. Furlong. The hearing was continued. The Court ordered the temporary commitment to stand; and the adjudication was deferred. The Court also ordered that Father was to be referred to BHS for consultation/evaluation forthwith. The Court ordered that CUA was to assist with obtaining appropriate bedding; was to conduct Pennsylvania State Police; Child Line; and Federal Bureau of Investigation (FBI) clearances on paternal aunt and uncle forthwith; and if cleared, Jo.P.

and Ja.P. may be moved. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023, Exhibit "A," ¶ "q", filed 5/3/2023).

At the permanency review hearing held on January 14, 2021, the Court granted a continuance due to the unavailability of the hearing officer. The Court ordered that A.G. was to remain as committed and placed. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023, Exhibit "A," ¶ "r", filed 5/3/2023).

On February 10, 2021, an adjudicatory hearing was scheduled before the Honorable Vincent W. Furlong. The hearing was continued due to no judge sitting. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023, Exhibit "A," ¶ "s", filed 5/3/2023).

On March 30, 2021, an adjudicatory hearing was held for Jo.P. and Ja.P. The Honorable Vincent W. Furlong adjudicated the Children dependent and found that they were without proper care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. The Court ordered the temporary commitment discharged and that the Children be fully committed to DHS. The Court further ordered that CUA/DHS was to make retroactive kinship payments to paternal aunt and uncle to the date of placement. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023, Exhibit "A," ¶ "t", filed 5/3/2023).

At the permanency review hearing on March 31, 2021, the Court ordered that A.G. remain as committed and placed; that Mother was to have two hour supervised community visits; and visitation may have been modified by the agreement of the parties. The Court further ordered that Mother was to be referred to CEU for a forthwith drug screen and random drugs screens prior to the next court date; was to be referred to a private facility for random drug screens if CUA could

not send Mother; and was to be rereferred to ARC. The Court also ordered that CUA was to follow up with a housing referral for Mother; CUA was to assist Mother with transportation if necessary; CUA was to continue to explore family members; and sibling's cases were to be linked for the next court date. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023, Exhibit "A," ¶ "u", filed 5/3/2023).

On June 1, 2021, the CUA NET held a SCP Meeting. Mother and Father did not participate. Mother's objectives were to maintain stable housing; enroll in and comply with a dual diagnosis program; sign all necessary ROI documents; cooperate with CUA; comply with ARC; and visit as allowed by the court order. Father's objectives were to sign all necessary ROI documents; cooperate with CUA; obtain stable housing; comply with The Wedge treatment program; and visit as allowed by the court order. The SCP goal for A.G. was reunification; and Jo.P. and Ja.P. was stabilization. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023, Exhibit "A," ¶ "v", filed 5/3/2023).

At the permanency review hearing held on August 4, 2021, the Court granted a continuance at the request of the Assistant City Solicitor so that the matter could be heard by a Judge. The Court ordered that all prior orders were to stand. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023, Exhibit "A," ¶ "w", filed 5/3/2023).

At the permanency review hearing on October 13, 2021, the Court found that no Family Finding Report was submitted as the assigned worker was no longer with CUA; and Jo.P. and Ja.P. had current Individual Education Plan's (IEP's). The Court ordered that A.G., Jo.P. and Ja.P. were to remain as committed and placed; that Mother's visitation with A.G., Jo.P. and Ja.P. were to remain as previously ordered; and Father was to have liberal supervised visits with Jo.P. and Ja.P. as arranged and supervised by the caregivers. The Court further ordered that Mother was to be

referred to CEU for monitoring. The Court also ordered that Mother's drug and alcohol treatment program was to provide CUA with an updated treatment plan and progress notes prior to the next court date; CUA was to ensure sibling visits continued; CUA was to submit a Safety Affidavit within seven days; CUA was to update the Family Finding Report; and it was to be PACFile within ten days and ten days prior to the next court date. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023, Exhibit "A," ¶ "x", filed 5/3/2023).

On November 30, 2021, the CUA NET held a SCP Meeting. Mother and Father did not participate. Mother's objectives were to maintain stable housing; enroll in and comply with a dual diagnosis program; sign all necessary ROI documents; cooperate with CUA; comply with ARC; and visit as allowed by the court order. Father's objectives were to sign all necessary ROI documents; cooperate with CUA; obtain stable housing; comply with The Wedge treatment program; and visit as allowed by the court order. The SCP goal for A.G. was reunification; and Jo.P. and Ja.P. was stabilization. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023, Exhibit "A," ¶ "y", filed 5/3/2023).

At the permanency review hearing held on January 5, 2022, the Court granted a continuance at Father's counsel's request that the matter be heard by a Judge. The Court further ordered that CUA was to submit a Safety Affidavit within seven days; a Family Finding Report was to be PAC Filed ten days prior to the next court date; and all prior orders were to stand. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023, Exhibit "A," ¶ "z", filed 5/3/2023).

The Court granted Father's Counsel's request to continue the permanency review hearing scheduled for February 17, 2022. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023, Exhibit "A," ¶ "aa", filed 5/3/2023).

At the permanency review hearing on March 25, 2022, the Court ordered that A.G., Jo.P. and Ja.P. were to remain as committed and placed; that Mother's visitation with A.G., Jo.P. and Ja.P. was to remain as previously ordered. The Court further ordered that Mother was to comply with SCP objectives; and was to enroll in a drug and alcohol treatment program. The Court also ordered that CUA was to explore sibling visits separate from Mother's; and CUA was to explore voluntary relinquishment of parental rights with Father. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023, Exhibit "A," ¶ "bb", filed 5/3/2023).

On May 10, 2022, CUA NET held a SCP Meeting. Mother and Father did not participate. Mother's objectives were to maintain stable housing; enroll in and comply with a dual diagnosis program; sign all necessary ROI; cooperate with CUA; comply with ARC; and visit as allowed by the court order. Father's objectives were to sign all necessary ROI; cooperate with CUA; obtain stable housing; comply with The Wedge treatment program; and visit as allowed by the court order. The SCP goal for A.G. was reunification; and Jo.P. and Ja.P. was stabilization. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023, Exhibit "A," ¶ "cc", filed 5/3/2023).

At the permanency review hearing held on June 22, 2022, the Court granted a continuance due to the unavailability of the Guardian Ad Litem (GAL) and Mother's counsel. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023, Exhibit "A." ¶ "dd", filed 5/3/2023).

At the permanency review hearing on August 18, 2022, the Court found that A.G. and Jo.P. had current IEPs; and Ja.P. received autism services. The Court ordered that A.G., Jo.P. and Ja.P. were to remain as committed and placed; that Mother's visitation with A.G., Jo.P. and Ja.P. was to be supervised at the agency; and Father's visits were modified to weekly supervised visits at the

agency. The Court further ordered that CUA was to provide A.G., Jo.P. and Ja.P. with clothing vouchers; CUA was to re-refer kinship referral; CUA was to assist grandfather with alternative fingerprinting location; and the assistant city solicitor was to conduct a Parent Locator Search (PLS) for Mother. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023, Exhibit "A," ¶ "ee", filed 5/3/2023).

On October 31, 2022, CUA NET held a SCP Meeting. Mother and Father did not participate. Mother's objectives were to maintain stable housing; enroll in and comply with a dual diagnosis program; sign all necessary ROI documents; cooperate with CUA; comply with ARC; and visit as allowed by the court order. Father's objectives were to sign all necessary ROI documents; cooperate with CUA; obtain stable housing; comply with The Wedge treatment program; and visit as allowed by the court order. The SCP goal for A.G. was adoption; and Jo.P. and Ja.P. was reunification. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023, Exhibit "A," ¶ "ff", filed 5/3/2023).

At the permanency review hearing on November 10, 2022, the Court found that Father was not compliant with the permanency plan. The Court ordered that A.G., Jo.P. and Ja.P. were to remain as committed and placed. The Court further ordered that Mother was to be referred to CEU for one random drug screen prior to the next court date; was to attend drug and alcohol treatment; and was to continue attending therapy. The Court also ordered that CUA was to setup supervised visits with parents if appropriate; was to complete clothing inventory and provide a clothing voucher if necessary; CUA was to continue to make outreach to parents; and all prior orders regarding Mother were to stand. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023, Exhibit "A," ¶ "gg", filed 5/3/2023).

At the permanency review hearing on February 3, 2023, the Court found that Father was minimally compliant with the permanency plan. The Court ordered that A.G., Jo.P. and Ja.P. were to remain as committed and placed; Mother was to have supervised visits at the agency; and Father was to have weekly supervised visits at the agency with 24 hour confirmation. The Court further ordered that Mother was to be referred to CEU for a forthwith drug screen, dual diagnosis assessment, and three random drug screens prior to the next court date; Mother was to avail herself to CUA; Father was to be referred to BHS for a consultation/evaluation. The Court also ordered that CUA was to follow up with resource parent to coordinate Jo.P. and Ja.P.'s autism evaluations; Ja.P. was to be referred to BHS for a psychological evaluation and medication management if appropriate, forthwith; CUA was to obtain consents for Ja.P.'s required treatment; and PLS was to be conducted on Mother. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023, Exhibit "A," ¶ "hh", filed 5/3/2023).

On April 18, 2023, the CUA NET held a SCP Meeting. Mother and Father did not participate. Mother's objectives were to maintain stable housing; enroll in and comply with a dual diagnosis program; sign all necessary ROI documents: cooperate with CUA: comply with ARC; and visit as allowed by the court order. Father's objectives were to sign all necessary ROI documents; cooperate with CUA; obtain stable housing; comply with The Wedge treatment program; and visit as allowed by the court order. The SCP goal for A.G. was adoption: and Jo.P. and Ja.P. was reunification. (DHS-Petition for Involuntary Termination of Parental Rights. CP-51-AP-0000176-2023, Exhibit "A," ¶ "ii". filed 5/3/2023).

Reunification with Mother is not a viable permanency option as she has failed to comply with her parental objectives. Mother has failed to consistently attend the children's court hearings. Mother has failed to consistently visit, plan for, or provide financial support for her children

throughout their time in placement. The conditions that necessitated the children's placement continue to exist and are not likely to be remedied in a reasonable time.

## STANDARD OF REVIEW AND LEGAL ANALYSIS

When reviewing an appeal from a decree terminating parental rights, an appellate Court is limited to determining whether the decision of the trial court is supported by competent evidence. *See In re K.C.W.*, 689 A.2d 294, 298 (Pa. Super. 1997). Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, an appellate court must accord the hearing judge's decision the same deference it would give to a jury verdict. *In re Child M.*, 452 Pa.Super. 230, 681 A.2d 793, 800 (1996). Appellate courts have expressed their deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. *In re T.S.M.*, 71 A.3d 251 (Pa. 2013). *In re Adoption of C.D.R.*, 111 A.3d 1212 (Pa. 2015). The Pennsylvania Superior Court need only agree with a trial court's decision as to any one subsection under 23 P.C.S.A. §2511(a) to affirm a termination of parental rights. *In re D.A.T.*, 91 A.3d 197 (Pa. Super. 2014).

Termination of parental rights is governed by §2511 of the Adoption Act. which requires a bifurcated analysis.

> Our case law has made clear that under §2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in §2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to §2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citing 23 Pa.C.S. § 2511, other citations omitted).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *R.N.J.*, 985 A.2d at 276.

With regard to §2511(b), the Superior Court has explained that:

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental. physical, and emotional needs and welfare of the child. In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005), the Superior Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, the Court instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. Id. However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *Id.* at 763. *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010).

A.R.G. was adjudicated dependent on December 23, 2020, and Jo.P. and Ja.P. were adjudicated dependent on March 30, 2021. The record and testimony presented at the Termination Hearing demonstrated Mother's and Father's inability to remedy the conditions that brought the Children into care.

The trial court noted that the Children are placed in kinship care with supportive caregivers. The trial court found that the testimony and evidence indicated that the Children and their caregivers share parental bonds, and the caregivers are providing for the Children's daily emotional and physical needs. In contrast, the trial court found that Mother and Father lacked the capacity and understanding to address their Children's basic emotional and physical needs. Consequently, documents and testimony presented at the termination hearing provided the trial court clear and convincing evidence to terminate Mother's and Father's parental rights and rule

that the termination of these rights would be in the best interests of the children pursuant to 23 Pa. C.S.A. §§2511(a)(1)(2)(5)(8)[5] and 23 Pa.C.S.A. § 2511(b)[6].

On July 6, 2023, this Court began hearing testimony regarding a petition to terminate Mother's and Father's parental rights. This petition was filed over a year prior to the date of the hearing. Testimony was also taken on November 2, 2023 and the court announced its decision on that date.

The court heard testimony from the CUA case manager. The record and testimony presented at the Termination Hearing demonstrated Mother's and Father's ongoing inability to

---

[5] (a) General rule.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency. 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

[6] (b) Other considerations.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental Factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

provide care for or control of their children. Their failure to remedy the conditions that brought the children into care indicated a continuing disregard of their parental duties.

Silvine Belzince testified that she is employed at CUA NET Community Care as a case manager and that she has supervised this case since its inception over three years ago. She testified that this case came into care due to a lack of parental supervision, inadequate housing, and drug and alcohol concerns. The Children resided with Mother at the time they came into care. The Children have never resided with Father. The Children are currently placed with their paternal uncle and aunt (N.T. July 6, 2023, Volume 1, Page 11 to 13).

Ms. Belzince testified that Mother's SCP objectives have remained the same throughout the life of the case. Those objectives included enrolling in drug and alcohol treatment and following the recommendations of the treatment program, signing all releases, obtaining safe and stable housing, visiting the children as ordered, and attending mental health counseling. (N.T. November 2, 2023, Volume 1, Page 15). Ms. Belzince stated that Mother reaches out to her often by telephone and that she goes over Mother's SCP objectives with her. She estimated that she has contact with mother at least two times per month. She has invited Mother to attend SCP meetings, but Mother has not attended a single meeting for the life of the case. (N.T. November 2, 2023, Volume 1, Pages 15 to 16).

Ms. Belzince testified that Mother has never gone to the Clinical Evaluation Unit (CEU) for drug and alcohol screens or assessments as ordered. She stated that Mother told her she did not need to go because she has a mental health problem and not a drug or alcohol problem. (N.T. November 2, 2023, Volume 1, Page 17). Regardless, she was ordered to be assessed for drug and alcohol treatment and never presented herself for an assessment.

Mother has never obtained safe and stable housing at any point during the pendency of the case. She reported to Ms. Belzince that she resides in shelters and with a family friend. She has never provided the identity or the address of the family friend to CUA. Mother was referred to the Achieving Reunification Center (ARC) for housing and parenting counseling. Mother never followed through with the housing component and never attended parenting classes despite both efforts being part of her SCP objectives. (N.T. November 2, 2023, Volume 1. Pages 18-19).

Mother was provided once a week supervised hour-long visits with the children at the CUA. At one point, earlier on in the case, Mother progressed to two-hour long visits with A.R.G. in the community. Ms. Belzince testified that Mother never completed a two-hour community visit with A.R.G. but rather continued with one-hour visits at the agency. Mother told Ms. Belzince that she did not want to do the two-hour visits in the community because she did not know what to do with A.R.G. for two hours in the community. Ms. Belzince told the court that Mother does not stay in touch with the children by telephone and does not ask her how the children are doing in the resource home. She noted that Mother has never participated in medical appointments for the children and does not give them gifts on holidays or their birthdays. Ms. Belzince testified that Mother's overall compliance with her SCP objectives is minimal. She also stated that Mother's progress toward reunification with the children is minimal. (N.T. November 2, 2023, Volume 1, Pages 20 to 24).

A.R.G. was initially placed with a foster parent in a different home than Jo.P. and Ja.P. He told Ms. Belzince that he did not want to stay in that home and wanted to be placed with his siblings. He was moved to same home as his brothers in September of 2023. Ms. Belzince testified that A.R.G. is doing well in the home and maintains good grades at school despite some behavioral issues. She noted that he has adjusted well in the kinship home. A.R.G. has expressed to Ms.

Belzince that he does not want to see Mother. He feels that Mother let him down and does not want to be his mother. She noted that he has no bond with Mother and wants someone who will love him. She testified that A.R.G. would not suffer any irreparable harm if Mother's parental rights were terminated. (N.T. November 2, 2023, Volume 1, Pages 25 to 31).

Ms. Belzince testified that at the time of the hearing, Jo.P. and Ja.P. had resided with the resource parent for over two years. She informed the court that Jo.P. is doing extremely well in the home and in school. She noted that he has a loving relationship with his Aunt who he refers to as "Mom" and his Uncle who he calls "Uncle" because Father corrected him about calling him "Dad." She testified that Jo.P. looks to his resource family for all his daily needs. Jo.P. has not asked to see Mother or Father. She added that Mother has never reached out to her to see how Jo.P. is doing in placement and has never given him any gifts. Ms. Belzince testified that Jo.P. shares no bond with Mother but is bonded to his current caregivers. Jo.P. has stated that he believes his Mother does not want him and has commented on the fact that she does not come to visits. He has informed Ms. Belzince that he is happy with the resource family and wants to stay there. (N.T. November 2, 2023, Volume 1, Pages 33 to 39).

Ja.P. is placed with his brothers with his paternal uncle and aunt. He is nonverbal and is autistic. He attends a school that specializes in educating autistic children. Ms. Belzince testified that he looks to the resource parents as his actual parents. She noted that his Aunt, with whom he lives, is a special education teacher whose background is very helpful in dealing with Ja.P. She noted that Ja.P. looks to his current caregivers for all his needs. Mother and Father have never reached out to see how Ja.P. is doing with the resource family and has never participated in any of his medical appointments. Ms. Belzince testified that she did not believe Ja.P. would suffer any

irreparable harm if Mother's parental rights were terminated. (N.T. November 2, 2023, Volume 1, Pages 40 to 45).

Child advocate, Lisa Visco, Esquire, provided an oral report regarding a meeting she had with the children to the court. She stated that all three children want to stay with their resource family and do not want to see Mother or Father. (N.T. November 2, 2023, Volume 1, Page 58).

Mother claims that her due process rights were violated because she was not provided notice of the termination and goal change petitions and notice of the hearing dates. On July 6, 2023, counsel for DHS told the court that service for Mother was attempted by mail and personal service at two separate addresses. At the time of the hearing, counsel for DHS was unable to locate proof that a PLS search for Mother had been completed. This court bifurcated the hearing and heard no testimony regarding Mother on that date. The court continued with the hearing on November 2, 2023. (N.T. July 6, 2023, Volume 1, Pages 8 to 10). On that date, DHS provided a PLS search for Mother that was completed three months prior to the Petitions to Terminate Mother's and Father's parental rights. (N.T. November 2, 2023, Volume 1, Pages 6-7). During the hearing on that date, Ms. Belzince testified that she spoke to Mother and that she informed Mother of the upcoming court date for the termination of parental rights hearing. She confirmed that Mother was aware of the court date. (N.T. November 2, 2023, Volume 1, Page 33).

It was clear from the testimony that a parent/child bond existed between the Children and their current caregivers. The testimony of Ms. Belzince was deemed to be credible and accorded great weight. Mother's lack of any progress for the life of the case, and her absence from SCP meetings, visits, and court hearings was obvious and telling. It was also clear to the Court that DHS followed all appropriate measures to serve Mother notice of the proceedings and that CUA had informed Mother of the hearing date. This court finds that Mother was aware of the

proceedings and the hearing dates and willfully failed to appear. A termination of parental rights hearing is not a game of hide and seek and Mother may not benefit from her conscious decision to not appear for the hearing despite having actual knowledge of its existence and the date on which it was to occur. Mother's inability, or unwillingness, to accomplish her SCP objectives throughout the history of the case proved to the trial court that the conditions which brought the Children into care had not been remedied.

## CONCLUSION

Based upon the testimony at the Termination of Parental Rights Hearing as well as the documents in evidence, the trial court finds that clear and convincing evidence existed to terminate both parents' parental rights pursuant to 23 Pa. C.S. 2511(a)(1) (2)(5) and (8). The trial court further finds that pursuant to 23 Pa. C.S. 2511(b), the termination of both parents' parental rights would not have a detrimental effect on the Children and that it was in the Children's best interests. For the foregoing reasons, this trial court respectfully requests that the Order terminating Mother's and Father's parental rights be AFFIRMED.

**BY THE COURT**

Date: 10/31/24

JOHN P. SABATINA, JR., J.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above-captioned Opinion was filed on the undersigned date in the Court of Common Pleas of Philadelphia County Family Court Division and served by first class mail upon the following:

Ariel Torres, Esquire
Philadelphia Law Department
One Parkway
1515 Arch Street-16th Floor
Philadelphia, PA 19102
Attorney for DHS

James Martin, Esquire
1800 John F. Kennedy Boulevard, Suite 300
Philadelphia, PA 19103

Lisa Visco, Esquire
723 Lombard St.
Philadelphia, PA 19147

Andre Martino, Esquire
7435 Sprague Street
Philadelphia, PA 19119

Gary Server, Esquire
52103 Delaire Landing
Philadelphia, PA 19114

Date: 10/31/24

JOHN P. SABATINA, JR., J.